JOE W. FOMAN, ADMR., RESPONDENT, v. LIBERTY LIFE INSURANCE COMPANY, APPELLANT.—51 S. W. (2d) 212.

Kansas City Court of Appeals. June 13, 1932.

*Ralph S. Latshaw, Jr.,* and *Ralph E. Griffith* for respondent.

*Carl R. Johnson* for appellant.

ARNOLD, J.—This is an action to recover on a policy of life insurance.

Defendant is a corporation, organized and existing under the laws of the State of Illinois, with its home office at the City of Chicago, in said State, and authorized to do business in the State of Missouri, and is engaged in writing life insurance.

The petition is formal, and alleges that on June 3, 1929, defendant, in consideration of a certain premium, agreed to insure the life of Exene Foman, under and by virtue of its policy No. I-15286, in the sum of $500; that on July 12, 1929, while said policy was in full force and effect, said Exene Foman died; that thereupon, according to the terms of said policy, the face thereof became due and payable; that defendant was duly notified of insured's death and proof thereof was duly furnished defendant; that payment of the face of the policy was duly demanded which defendant had neglected and refused to pay, and that said refusal to pay was vexatious and without due cause; that said refusal made it necessary to employ attorneys to bring action thereon; that $250 is a reasonable attorney's fee for services rendered and to be rendered in the prosecution of said action. Judgment is asked in the sum of $500, the face of the policy, $50 for vexatious delay and $250 attorney's fee, together with 6 per cent interest from July 12, 1929.

The answer admits defendant's corporate status, and that it is engaged in writing life insurance in the State of Missouri and various other states, and generally denies all other allegations of the petition.

During the progress of the trial, and by leave of court, an amended answer was filed in which the corporate status of defendant and that it is licensed to do business in the State of Missouri were admitted, and that it issued its policy on the life of Exene Foman, as alleged in the petition. As affirmative defense, the amended answer alleges that at the time the application for the insurance was made, the applicant was not in sound health; that she knew she was not in sound health but "was suffering or inflicted with a venereal disease, specifically salpingitis, and that her unsound health and the venereal disease contributed to her contingency and her death, or was the cause thereof." Further answering defendant "denies each and every other material allegation in plaintiff's petition contained."

The cause was tried to the court and jury, in the circuit court of Jackson County at Independence, resulting in a verdict and judgment for plaintiff in the sum of $500, the face of the policy, $50 penalty and $250 attorney's fee. A motion for a new trial was ineffectual, and defendant appeals.

The policy which was introduced in evidence provided for the payment of the face thereof to the executor or administrator of the estate of the insured, and further provided:

"No obligation is assumed by the company prior to the date hereof, nor unless on said date the insured is alive and in sound health."

The record discloses and the petition so alleges that plaintiff herein is the father of deceased and on May 10, 1930, was duly appointed administrator of the estate of the deceased and, as such, he brings this action.

At the threshold of this case we are confronted with a motion by plaintiff to dismiss the appeal and attacking the sufficiency of defendant's statement of the case, in that it violates the requirements of section 1060, Revised Statutes 1929, and our rule 16. Section 1060 requires that the appellant shall make out and furnish the court with "a clear and concise statement of the case and the points intended to be insisted on in the argument." Our rule 16 provides "the statement . . . shall consist of a clear and concise statement of the case without argument, reference to issues of law or repetition of the testimony of witnesses." It is charged in the motion that defendant's statement violates the statute cited and our rule 16, and asks dismissal of the appeal, as provided by our rule 18. With these rules in mind, we have examined the alleged offending statement, and while it may not be such as would ordinarily be furnished and requires some search of the record, yet it does set out with a sufficient amount of clarity such a statement as to enable us to have a fair understanding of the case without laborious effort and reference to the record. Under these circumstances, we do not feel warranted in applying the drastic action authorized by our rule 18, and the motion to dismiss the appeal is hereby overruled.

Other points are raised in the motion to dismiss, but as these refer to matters properly to be considered in passing on the case on its merits, they will receive attention in due course.

There are nine assignments of error, consisting of a *verbatim* reproduction of defendant's motion for a new trial. While plaintiff makes much of this fact, we know of no rule of law whereby an appellant may not adopt the points urged in his motion for rehearing, as the basis of his assignment of errors. These nine assignments of error are discussed under three points and authorities.

There is no dispute that the insured, in her application for the insurance, stated she was of sound health at that time. Under the answer, the question at issue is whether, in fact, the insured was in sound health at that time and at the time the policy was issued. It

is defendant's contention she was not, and it is urged the trial court erred in refusing certain testimony on that point.

The testimony on behalf of plaintiff on the question of decedent's illness is, that on June 29, 1929, she was in the employ of one Mrs. Hornbuckle; that she was suddenly taken ill and Mrs. Hornbuckle brought her to her sister's home; the following day, she was taken to a hospital in Kansas City, Kansas, and later brought back to the City Hospital in Kansas City, Missouri, where she died on July 12, 1929. Plaintiff testified decedent had not been ill prior to her last illness.

Decedent's sister, Lydia Bell, to whose home she was brought by Mrs. Hornbuckle when she was taken ill, testified decedent had given birth to a child on October 22, 1928; that the child was still alive and was two years of age at the time of the trial; that decedent was not sick previous to her last illness. Mrs. Fay Miller, an employer of decedent in 1926 to 1928, testified decedent was never ill during that period, and never laid off a day. Mrs. Hornbuckle testified decedent had been in her employ from sometime in 1928 until witness and her husband went on a trip that fall, and that decedent came back to work in March, 1929; that decedent was taken ill the last of June, 1929; that prior to that time she was never ill, but was faithful and regular; that she was suddenly taken ill in the afternoon and witness took her to the home of her sister, Mrs. Bell; that she seemed to be in acute pain, as though it might be appendicitis, very acute and sudden.

In support of the allegations of defendant, there was introduced the testimony of Doctors R. C. Loman, William A. Johnson, William A. Hambrick and Percy Turner. Dr. Johnson testified to having called on decedent just prior to her death, and after her death, held an autopsy on her body; that he signed the death certificate, giving the cause thereof as "peritonitis, from rupture of a dermoid cyst." During the direct examination of Dr. Johnson, the following occurred:

"Q. What did you find as to the cause of her death? A. The direct cause of her death was pelvic peritonitis.

"Q. Anything else? A. The contributory cause was a ruptured dermoid cyst.

"Q. Anything else? A. Not that could be construed as a cause of death.

"Q. Ruptured dermoid cyst was one; and what was the other? A. Pelvic peritonitis.

"Q. Will you explain to the jury what is a dermoid cyst? A. A dermoid cyst is an abnormal growth usually connected in some way with the ovary, which has its origin during the embryological de-

velopment of the organism before birth. It usually contains hair, teeth, fragments of bone, and is thought to be caused by displacement of some of the elementary tissues that go to form these particular organs.

.  .  .  .  .  .

"Q. Will you explain to the jury what is meant by pelvic peritonitis? A. Pelvic peritonitis is an inflammation of the lining of the pelvic or lower abdominal cavity.

"Q. Inflammation of what? A. The pelvic or lower abdominal cavity.

"Q. When you discovered the ruptured cyst, what did you find as to its contents? A. Hair, and an oily substance. Nothing more."

On cross-examination, witness testified "the rupture of the cyst was the contributory cause." The only mention made of the "salpingitis" alleged in the answer was by Dr. Turner, testifying for defendant, when he said in answer to the question, "What are the usual causes of peritonitis?" "They are many. Salpingitis is one: and ruptured appendix is one; and tubercular infection another; and chronic diarrhea is another. There are many."

Dr. Johnson, on cross-examination, also testified:

"Q. There are many persons who go through life and are buried with that dermoid cyst in their systems? A. Yes, sir."

Dr. Hambrick testified: "The existence of a dermoid cyst is an abnormal condition  .  .  .  'it is congenital and begins at the birth of the individual."  .  .  .  "peritonitis can set in from a few minutes to a few days. It can begin immediately and that you can have a rupture in the system and peritonitis might set in immediately and cause death within a couple of hours and that a dermoid cyst might burst and immediately set up an infection that could ensue in a few hours."

From the testimony, we are unable to say defendant was entitled to a verdict as a matter of law. There was substantial evidence in plaintiff's behalf from which the jury well might have concluded decedent was in good health at the date of the application and issuance of the policy. Furthermore there was no request for a directed verdict on the part of defendant.

The record discloses decedent was taken to St. Margaret's Hospital in Kansas City, Kansas, and was there treated by Dr. R. C. Loman, a member of the medical staff of that institution; that she was later brought to the City Hospital in Kansas City, Missouri, where she died the day following the transfer. Dr. Loman, introduced as a witness for defendant, was asked to testify as to "what you found." An objection to the question was sustained on the ground the doctor's information was privileged. Defendant charges

error in this respect. Dr. Loman did testify to the extent of stating that he examined decedent for the purpose of treating her, and that each time he saw her it was for the purpose of treating her as a patient. Under the provisions of section 1731, Revised Statutes 1929, the trial court properly sustained the objection. The record further discloses no offer was made as to what was intended to be proved by the witness, relating to decedent's condition of health on June 3, 1929, at the time the application was made or the policy issued.

Under the circumstances, the cases of Cardinale v. Kemp, 309 Mo. 241, 274 S. W. 437, and Smart v. Kansas City, 208 Mo. 162, 105 S. W. 709, are controlling. It has been held that, without the consent of the patient, an attending physician cannot testify to any information gained by observation or conversation. [Corbett v. Railway, 26 Mo. App. 621; State v. Kennedy, 177 Mo. 98, 75 S. W. 979.] The physician need not be employed or paid by the patient. [Epstein v. Railway, 250 Mo. 1, 156 S. W. 699; Obermeyer v. Mfg. Co., 120 Mo. App. 59, 96 S. W. 673. [See, also, Masson v. Ins. Co. (Mo. App.), 36 S. W. (2d) 118.] There was no waiver of privilege by the institution of the suit. [26 R. C. L., sec. 134, p. 544; 40 Cyc. 2399, 2402.]

Under point 2, defendant urges the court erred in excluding the testimony of Dr. P. C. Turner, as to his opinion that an individual possessing an abnormal growth such as a dermoid cyst could reasonably be considered as being of unsound health. The record discloses Doctor Turner was introduced as an expert witness. It is urged the jury was entitled to the aid of expert or skilled witnesses in arriving at a verdict. This is true, but such expert evidence must be properly introduced to be admissible. The amended answer alleges specifically that "salpingitis" was the cause, or contributed to the death of insured. Dr. Turner was asked his opinion relative to "dermoid cyst." Such inquiry was not warranted under the specific allegation in the answer and therefore was not admissible. [Thompson v. United Rys. Co. (Mo. App.), 249 S. W. 105, 106.] Before a witness, introduced as an expert, can give his opinion on the question of the health of the insured, he must be properly furnished with all the details in connection with the case in the form of a hypothetical question; in fact a hypothetical question properly worded, including all the details and facts. No hypothetical question was asked Dr. Turner, but only questions calling for conclusions. As in the case of Dr. Loman, defendant made no offer of proof by Dr. Turner. Therefore there is nothing for us to review. [Cardinale v. Kemp, 274 S. W. 437, 447.]

Defendant contends, in its assignments of error, that the court erred in refusing to admit in evidence a certificate of death issued by the Bureau of Vital Statistics of the Missouri State Board of Health, under its seal, the same being a public record showing the death of the insured. This point is not presented under defendant's points and authorities, nor is it discussed in the argument. Hence we consider it abandoned. However, it is noted that Dr. William A. Johnson, who signed the death certificate, testified to all matters contained therein, and also testified that he performed an autopsy on the body of the insured as a prerequisite for the signing of the death certificate by him; and he was allowed to testify to all the findings in detail. Defendant, therefore, is in no position to complain in this respect. We rule there was no error in the refusal of the death certificate in evidence, and that if said ruling was error, it was harmless under the circumstances.

Defendant urges the court erred in its refusal to admit in evidence certain correspondence between defendant and J. M. Gilpatrick, former attorney for plaintiff. This matter does not appear either in the assignment of errors nor under points and authorities, but is raised for the first time in the printed argument. This point therefore is not properly before us for consideration.

Finally, it is urged—

"The court erred in permitting counsel for the respondent to use such words and language to the jury as would prejudice said jury against the rights and interest of the defendant, in that counsel for the plaintiff was permitted to testify in an exaggerated manner as to lawful continuances granted by the court as though said continuances were vexatiously and unfairly obtained by the defendant to the harassment of the plaintiff."

The point is mentioned as assignment of error No. 8, but is not urged nor mentioned in points and authorities, and there are no authorities cited in support of the contention. It is therefore considered abandoned.

Assignment No. 7 is as follows:

"That the verdict of the jury with respect to attorneys fees allowed plaintiff was excessive, unreasonable and contrary to the spirit of the law with respect thereto."

There is no reference to this assignment in defendant's points and authorities, nor in the printed argument; nor are there any citations of authorities in support of defendant's position in this behalf. Therefore we may not consider it.

All points raised have been covered in what we have said. The judgment is affirmed. All concur.